19 F.3d 110
 Nicholas KONTAKIS
v.
Howard L. BEYER; Attorney General of the State of New
Jersey, Robert J. Del Tufo.
Howard L. Beyer, and Robert J. Del Tufo, Appellants.
Nicholas KONTAKIS, Appellant,
v.
Howard L. BEYER; Attorney General of the State of New
Jersey, Robert J. Del Tufo.
 Nos. 93-5178, 93-5198.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 3, 1994.
Decided March 11, 1994.
Sur Petition for Rehearing April 8, 1994.
 
 John Vincent Saykanic (argued), Clifton, NJ, for Nicholas Kontakis.
 Robert J. Del Tufo, Attorney General of New Jersey, Linda K. Danielson (argued), Deputy Attorney General, Trenton, NJ, for Howard L. Beyer and Robert J. Del Tufo.
 Before: GREENBERG and ROTH, Circuit Judges, and POLLAK, District Judge.*
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 
 1
 By an order entered on February 16, 1993, as amended by an order entered on March 8, 1993, the district court granted Nicholas Kontakis' petition for a writ of habeas corpus, finding that under Humanik v. Beyer, 871 F.2d 432 (3d Cir.), cert. denied, 493 U.S. 812, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989), the state trial court's jury instructions in his murder trial were unconstitutional. The district court, however, rejected the numerous other contentions Kontakis raised to support his claim for habeas relief. The respondents, the Superintendent of the New Jersey State Prison and the Attorney General of New Jersey, appeal as they contend that the jury instructions error was harmless. Kontakis cross-appeals, maintaining that he is entitled to relief on certain of his other contentions. We will reverse the district court's order granting the writ, and will reject Kontakis' arguments raised in his cross-appeal. Inasmuch as Kontakis could have advanced the issues specified in his cross-appeal as alternative grounds to affirm,[1] we are considering them as being made in support of the result reached in the district court. Accordingly, we treat Kontakis solely as the appellee.
 
 
 2
 I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY
 
 
 3
 On March 25, 1985, Kontakis killed his estranged wife, Margaret Kontakis. At about noon that day, they had been arguing near a car on Railroad Avenue in Franklin Township, Somerset County, New Jersey. Kontakis then shoved his wife into the car and a struggle ensued. After attempts of bystanders to intervene failed and a police car arrived, Kontakis fired three fatal shots from his handgun into his wife's head from close range while she sat in the car. Several witnesses, including the chief of the Franklin Township Police Department, observed the shooting. A Somerset County grand jury indicted Kontakis for purposeful murder in violation of N.J.Stat.Ann. Sec. 2C:11-3(a)(1) (West 1982), and for knowing murder in violation of N.J.Stat.Ann. Sec. 2C:11-3(a)(2) (West 1982). Thereafter, Kontakis pled not guilty.
 
 
 4
 At the ensuing jury trial, Kontakis contended that he did not have the requisite mental state to act purposely or knowingly when he killed his wife. A psychiatrist he called as a witness, Dr. Irwin Perr, testified that at the time of the murder Kontakis suffered from an adjustment disorder and an "atypical personality disorder with features of both narcissistic and paranoid personalities." But Perr also testified that he could not give an opinion confidently as to whether Kontakis was acting purposely or knowingly at the time of the homicide. In rebuttal, the state called Dr. Harry Brunt as a witness, and he testified that Kontakis suffered from "a borderline personality disorder," which did not affect his ability to tell right from wrong or to act "with purpose or knowledge."
 
 
 5
 Kontakis called four lay witnesses who testified as to his state of mind immediately prior to the killing. First, his brother Samuel Kontakis testified that in January and February 1985, Kontakis threatened suicide and acted irrationally. Second, Theresa Mary Hartley testified that Kontakis was so "obsessed" with his marital problems that it even affected his ability to drive a car. Hartley further testified that Kontakis telephoned her 10 or 11 times each night about his problems. Third, Mary Retner testified that on the day before the shooting, Kontakis was "in a very bad state of mind, ... was acting very irrationally, ... [and] was very suicidal that night." Finally, Kontakis' mother testified that he threatened to kill himself twice daily in March 1985.
 
 
 6
 The trial judge instructed the jury that when assessing whether the state had proven each element of the offense beyond a reasonable doubt, it "need not consider the [mental disease or defect] evidence as to the defendant's state of mind;"[2] if the jury found each element proven beyond a reasonable doubt, it "must then consider the evidence as to the defendant's state of mind;" if Kontakis suffered from a mental disease or defect at the time of the murder negating the proof of his state of mind "he cannot be said to have acted purposely or knowingly;" and "[i]f there is no preponderance of evidence as to mental disease or defect, negating state of mind, the defense fails." The trial court based these jury instructions on N.J.Stat.Ann. Sec. 2C:4-2 (West 1982).[3]
 
 
 7
 On October 10, 1985, the jury found Kontakis guilty of purposeful murder. On December 13, 1985, the trial court denied Kontakis' motion for a new trial, and sentenced him to life imprisonment with a 30-year parole disqualifier. Kontakis appealed, but on November 5, 1986, before deciding the appeal, the New Jersey Superior Court, Appellate Division, granted Kontakis' motion for a limited remand to allow him to move before the trial court for a new trial based on newly discovered evidence. On the remand, the trial court denied the motion for a new trial.
 
 
 8
 Following the remand, the Appellate Division affirmed Kontakis' conviction on July 12, 1989, rejecting his argument that he was entitled to relief on the basis of Humanik which had been decided March 31, 1989. Kontakis next petitioned the New Jersey Supreme Court for certification, but the court denied the petition on October 31, 1989. However, Kontakis then successfully moved in that court for reconsideration and it remanded the case to the Appellate Division for reconsideration in the light of a "memorandum from the [New Jersey] Chief Justice in respect to the mental disease or defect defense." This memorandum gave instructions to the New Jersey courts concerning the application of the then recently decided Humanik. On the remand, the Appellate Division on August 30, 1990, reaffirmed Kontakis' conviction, concluding "that the trial court's jury instructions on [Kontakis'] burden of proof constituted harmless error" "beyond any reasonable doubt." Kontakis then again filed a petition for certification which the New Jersey Supreme Court denied on December 4, 1990.
 
 
 9
 On August 5, 1991, Kontakis filed a petition for a writ of habeas corpus in the district court, contending that he was entitled to relief under Humanik as well as on various other grounds.[4] In accordance with its comprehensive memorandum opinion, the district court granted the writ. The court indicated that Humanik compelled it "to conclude, reluctantly, that [Kontakis] was denied due process of law in violation of the Fourteenth Amendment when the trial judge gave a jury instruction on the law of diminished capacity based upon statutory language which the Court of Appeals for the Third Circuit has found to be unconstitutional." The court, however, rejected Kontakis' remaining arguments. An order granting the writ was entered on February 16, 1993, and it was amended by an order entered on March 8, 1993. The state officials then appealed.[5] We must answer three questions on this appeal: (1) whether the jury instructions were constitutionally defective under Humanik; (2) if so, whether the error was harmless; and (3) assuming we find the jury instruction to be constitutionally sound or any error therefrom harmless, whether the district court correctly rejected Kontakis' other arguments.
 
 II. DISCUSSION
 A. Scope of Review
 
 10
 Our review of the district court's decision is plenary, as its order was not the product of fact finding following an evidentiary hearing. Zettlemoyer v. Fulcomer, 923 F.2d 284, 291 n. 5 (3d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 280, 116 L.Ed.2d 232 (1991). However, our review of the state criminal proceedings is limited, for as the Supreme Court recently has emphasized, in "conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, --- U.S. ----, ----, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) (citations omitted).
 
 
 11
 B. Whether the jury instructions violated the holding in
 
 Humanik
 
 12
 We agree with the district court that the jury instructions were constitutionally erroneous under Humanik. Humanik involved an appeal from the denial of a petition for a writ of habeas corpus following the petitioner's New Jersey conviction for purposeful and knowing murder. In Humanik, the petitioner argued that the New Jersey statute, N.J.Stat.Ann. Sec. 2C:4-2 (West 1982), pursuant to which the jury instructions on mental disease and defect were formulated, was unconstitutional. At the trial, the court charged the jury as follows:
 
 
 13
 In connection with the question of the defendant's mental state at the time in question, since the defendant has raised this defense, that is, the defense that he had a mental disease or defect at the time which prevented him from having the state of mind the law says he would have to have, that is, a knowing or purposeful mental state in connection with the killing, he has the burden to prove that he had such mental defect or disease by a preponderance of the evidence
 
 
 14
 Humanik, 871 F.2d at 435 (emphasis by the court in Humanik ).
 
 
 15
 In Humanik, we recognized that under New Jersey law the mental disease and defect defense was not an affirmative defense, but was relevant only to show that the defendant did not possess the requisite intent for committing the offense. Id. at 438-39 (citing State v. Breakiron, 108 N.J. 591, 532 A.2d 199, 208 (1987)). We then found that the instruction would lead "a rational juror attempting to attribute some significance to the instruction [to] conclude that the defendant's evidence [on state of mind] should be considered only if the juror finds it to be more likely true than not true." Id. at 442. We therefore concluded that the instruction impermissibly altered the state's burden to prove beyond a reasonable doubt that the petitioner acted purposefully or knowingly when he committed the murder.
 
 
 16
 At Kontakis' trial the instructions were similar to those we rejected in Humanik. The court instructed the jury that when assessing whether the state had proven each element of the offense beyond a reasonable doubt, it "need not consider the evidence as to the defendant's state of mind;" if the jury finds each element proven beyond a reasonable doubt, the jury "must then consider the evidence as to the defendant's state of mind;" if Kontakis suffered from a mental disease or defect at the time of the murder, negating the proof of his state of mind, "he cannot be said to have acted purposely or knowingly;" and "(i)f there is no preponderance of evidence as to mental disease or defect, negating state of mind, the defense fails."
 
 
 17
 These instructions unconstitutionally altered the state's burden to prove that Kontakis acted purposely when killing his wife, in that they could have caused "a rational juror attempting to attribute some significance to the instruction [to] ... conclude that the defendant's evidence [on state of mind] should be considered only if the juror finds it to be more likely true than not true." Humanik, 871 F.2d at 442. The instructions suggested that the jury should have ignored Kontakis' defense that he did not possess the requisite state of mind unless "there is ... [a] preponderance of evidence as to mental disease or defect." Thus, they permitted the jury to ignore Kontakis' mental disease and defect evidence unless the jury found that evidence more probable than not.
 
 
 18
 Consequently, the instructions failed to allow for the possibility that Kontakis' mental disease and defect evidence, although not rising to the level of being more probable than not, created a reasonable doubt as to whether he had the requisite intent to commit the offense. We find, therefore, that the instructions unconstitutionally altered the state's burden to prove intent beyond a reasonable doubt.
 
 
 19
 C. Whether the jury instructions error was harmless
 
 
 20
 The Appellate Division held that the error was harmless beyond a reasonable doubt, because under State v. Breakiron, 108 N.J. 591, 532 A.2d 199, Perr, Kontakis' psychiatric witness, should "never have been permitted to testify" with respect to Kontakis' mental disease or defect.[6] Indeed, the Appellate Division found that "[t]he only possible consequence of the judge's erroneous admission of [Kontakis'] mental disease or defect evidence and instructing the jury on the point was to improve unjustifiably [his] chances of securing a verdict to a reduced charge of homicide."
 
 
 21
 The district court rejected the Appellate Division's finding of harmless error, indicating:
 
 
 22
 In light of the Third Circuit's explicit directive that 'a jury may not be told in this context that the mental disease or defect "evidence must be put aside ... unless it satisfied the preponderance standard," ' ... the Court cannot adopt the Appellate Division's conclusion that any error was harmless because petitioner was not entitled to the instruction. Whether he was entitled to it or not, the Third Circuit has determined that such an instruction is prejudicial. Moreover, even if the trial judge actually had made explicit to the jury [that] the premise underpinning the State's argument--i.e., if the judge had instructed them, 'Ignore the charge on diminished capacity, because defendant is not entitled to it'--the Third Circuit also has indicated that '[a] charge that contradicts a constitutionally impermissible instruction does not cure the problem, ... when there is a reasonable likelihood that a juror may have understood the charge as conveying an unconstitutional message.' (App. at 21-22) (emphasis in original; citations omitted).
 
 
 23
 Moreover, the district court ruled that "(g)iven that the jurors were not instructed that petitioner had failed to satisfy the threshold Breakiron requirements, the likelihood of misunderstanding is at least as great in this case as it was in Humanik.
 
 
 24
 Our focus in reviewing the district court's grant of the writ is on whether Kontakis' conviction violated "the Constitution, laws or treaties of the United States." See Estelle v. McGuire, --- U.S. at ----, 112 S.Ct. at 480. Therefore Humanik does not compel or even permit us to grant the writ without considering whether the error was harmful. A contrary holding would violate well-settled Supreme Court precedent that "a constitutional error does not automatically require reversal of a conviction." Arizona v. Fulminante, 499 U.S. 279, 306, 111 S.Ct. 1246, 1263, 113 L.Ed.2d 302 (1991) (Rehnquist, C.J., delivering opinion of the Court on Part II) (citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).
 
 
 25
 The Court in Fulminante recognized that, after Chapman, the Court "has applied harmless error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless." Fulminante, 499 U.S. at 306, 111 S.Ct. at 1263 (Rehnquist, C.J.). In discussing the possibility that an error was harmless the Court included a long list of cases involving " 'trial error'--error which occurred during the presentation of the case to the jury." These cases included opinions considering infirm jury instructions.[7] Id. Accordingly, we hold that Fulminante requires us to make a harmless error analysis when determining whether habeas relief should be granted on the basis that there had been unconstitutional jury instructions at a state trial.
 
 
 26
 The Supreme Court now has ruled that in a habeas case, as distinct from a direct appeal, federal courts should apply the test set forth in Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946), to determine whether constitutional trial errors are harmless. Brecht v. Abrahamson, --- U.S. ----, ----, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993). The Kotteakos test provides that the error is not harmless if it "had substantial and injurious effect or influence in determining the jury's verdict." Id. at ----, 113 S.Ct. at 1722 (quoting Kotteakos, 328 U.S. at 776, 66 S.Ct. at 1253).[8] Thus, as the Supreme Court has found that errors in jury instructions fall within the category of trial errors, we apply the Kotteakos harmless error standard.[9]
 
 
 27
 The Supreme Court has provided specific guidance for assessing whether a constitutional error in a jury instruction was harmless. In Estelle v. McGuire the Court found that the "only question for us is 'whether the ailing jury instruction by itself so infected the entire trial that the resulting conviction violates due process.' " --- U.S. at ----, 112 S.Ct. at 482 (quoting Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)). Moreover, Estelle recognized that "the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." --- U.S. at ----, 112 S.Ct. at 482 (quoting Cupp v. Naughten, 414 U.S. at 147, 94 S.Ct. at 400-01); see also Rock v. Zimmerman, 959 F.2d 1237, 1247 (3d Cir.) (in banc), cert. denied, --- U.S. ----, 112 S.Ct. 3036, 120 L.Ed.2d 905 (1992).
 
 
 28
 We hold that, under the reasoning of Estelle and Cupp, in our assessment whether Kontakis' conviction violated the Constitution, laws or treaties of the United States, we should view the state criminal proceeding as a whole, including the opinions on the state appeals. See Sumner v. Mata, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Of course, we need not follow a state court decision construing federal or constitutional law. Nonetheless, we find no justification for isolating the trial from the balance of the state criminal proceedings when we determine whether the giving of unconstitutional jury instructions requires that we grant a habeas remedy.
 
 
 29
 But Kontakis argues that Perr's testimony satisfied Breakiron's admissibility standards and therefore the Appellate Division erred as a matter of state law when it found his mental disease and defect evidence inadmissible. Accordingly, he views the Appellate Division opinion as flawed.[10] Kontakis also argues that he satisfied the Breakiron test by introducing other evidence admissible under state law to support his contention that his mental state negated an element of the offense.[11] Accordingly, Kontakis contends that the erroneous instructions allowed the jury to disregard valid evidence supporting his Humanik argument.
 
 
 30
 The difficulty with Kontakis' contention regarding the admissibility of Perr's testimony is that it cannot be accommodated to the principle that "federal habeas corpus relief does not lie for errors of state law." Estelle v. McGuire, --- U.S. at ----, 112 S.Ct. at 480 (citations omitted). Indeed, the Supreme Court has ruled that "the Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438 n. 6, 103 S.Ct. 843, 853 n. 6, 74 L.Ed.2d 646 (1983) (citing Spencer v. Texas, 385 U.S. 554, 564, 87 S.Ct. 648, 653-54, 17 L.Ed.2d 606 (1967)).[12] Therefore, we will not review the Appellate Division's evidentiary ruling for errors of state law as if we were the New Jersey Supreme Court.
 
 
 31
 Rather, we limit our review to determining whether, when viewing the state criminal proceedings as a whole, including the appellate proceedings, Kontakis' conviction violated his constitutional rights. Therefore, as Kontakis does not argue that the exclusion of Perr's testimony violated his constitutional rights, we accept the Appellate Division's opinion and we will exclude that testimony in our harmless error analysis. The jury, after all, should never have heard the evidence and thus should not have been permitted to base a verdict on it. Therefore even though, as the district court noted, the instructions carried "an unconstitutional message" that did not matter.
 
 
 32
 If there were no other state of mind evidence, this would end our inquiry for, as the Appellate Division concluded, in these circumstances Kontakis could not possibly have been harmed by the faulty instructions. The instructions would have done nothing more than place a burden on Kontakis to establish a defense not even in issue in the case. But they would not have altered the state's obligation to prove the elements of the offense beyond a reasonable doubt. In fact, if Perr's testimony had been stricken at the trial, and the erroneous instructions nevertheless given, they could have been used by the jury only to cast doubt on the state's case even though they would have been given in a vacuum, i.e., given though not justified by the evidence.
 
 
 33
 But this conclusion in itself does not resolve the question of whether the giving of the unconstitutional jury instructions was harmless error, for we must address the possibility that the instructions precluded the jury from properly considering Kontakis' lay evidence concerning his state of mind. We will assume without deciding that the erroneous instructions could have caused a reasonable juror to disregard Kontakis' lay evidence on state of mind unless the juror found the evidence more probable than not. Therefore, as required by Brecht, we consider whether the jury's possible failure to consider the evidence had a "substantial and injurious effect or influence in determining the jury's verdict."
 
 
 34
 Accordingly, we reiterate Kontakis' state of mind evidence. First, his brother testified that in January and February 1985, Kontakis threatened suicide and acted irrationally. Second, Hartley testified that Kontakis was "obsessed" with his marital problems such that he was unable to drive a car and called her 10 or 11 times each night. Third, Retner testified that on the day before the shooting, Kontakis was "in a very bad state of mind, ... was acting very irrationally, ... [and] was very suicidal that night." Finally, his mother testified that Kontakis threatened suicide twice daily in March 1985.
 
 
 35
 While there can be no doubt that the lay evidence demonstrated that Kontakis was emotionally distraught when he killed his wife, it is clear that the evidence regarding Kontakis' acting purposely at the time of the shooting was so overwhelming that even if the jury did not consider Kontakis' lay state of mind evidence, this omission could not have had a "substantial and injurious effect or influence in determining the jury's verdict." Indeed, Kontakis' lay evidence did not tend to negate the evidence that on the day of the shooting he acted purposely or knowingly. Quite to the contrary, it demonstrated the anger he felt and supplied evidence of his motive to act purposely in retaliation for what he believed was his wife's misconduct. In this regard we emphasize that we are concerned with evidence of Kontakis' mental state insofar as it related to his ability to act purposely and knowingly rather than in the abstract or for some other purpose.
 
 
 36
 Of course, the evidence that Kontakis acted purposely and knowingly is manifest. It demonstrated that: (1) two days before the shooting Kontakis rented a car so he could follow his wife secretly in a car she would not recognize; (2) on the day of the shooting, he waited outside Granny's Deli and the post office for his wife to enter the post office; (3) after she left the post office he shoved her into an automobile; and (4) after arguing with his wife, he shot her three times in the head from a close distance. It would be difficult to produce more compelling evidence that a person committing a homicide acted purposely and knowingly. Furthermore, Brunt testified that Kontakis' mental problems did not affect his ability to act with purpose and knowledge and Perr did not contradict him on this point. Therefore, we reject the district court's order that Kontakis was entitled to habeas relief on the basis of Humanik.
 
 D. Kontakis' other issues
 1. Jury Selection
 
 37
 Kontakis contends that the voir dire denied him a fair and impartial jury in violation of the Sixth Amendment and the due process clause. He objects to the trial court's use of a written questionnaire that was "to be completed out of the presence of counsel and the court." Brief at 57.
 
 
 38
 In assessing this argument, we do not review the voir dire for violations of New Jersey law; rather, our "authority is limited to enforcing the commands of the United States Constitution." Mu'min v. Virginia, 500 U.S. 415, ---, 111 S.Ct. 1899, 1903, 114 L.Ed.2d 493 (1991). We may grant a writ predicated on a finding that a fair and impartial jury was denied only if we find that the state courts committed "manifest error" in rejecting this contention. Rock v. Zimmerman, 959 F.2d at 1252 n. 8. Here, we find no "manifest error," and indeed no error at all, in the conclusion reached by the state courts that the voir dire did not result in an unfair or prejudiced jury. The district court accurately summarized the reasons why the voir dire passed constitutional muster when it stated:
 
 
 39
 The voir dire transcripts reveal that the trial court patiently questioned potential jurors orally after they completed the written questionnaire. Moreover, petitioner's attorney had ample opportunity to submit questions to the trial court in order to clear up any misunderstanding resulting from potential jurors' written answers. Before swearing in the jury, the court gave petitioner's counsel the opportunity to challenge its composition [and] petitioner failed to exhaust his peremptory challenges. (App. at 24).
 
 
 40
 Thus, we reject Kontakis' argument that the voir dire violated his constitutional rights.
 
 2. Passion/provocation manslaughter
 
 41
 Kontakis contends that the trial court's refusal to charge the jury on passion/provocation manslaughter, as provided in N.J.Stat.Ann. Sec. 2C:11-4(b)(2) (West 1982), violated his constitutional rights under Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).[13] That section provides that a homicide which otherwise would be murder is manslaughter if it "is committed in the heat of passion resulting from a reasonable provocation." In Beck, the Supreme Court held that in a capital case the trial court committed constitutional error when it would not charge on a lesser-included offense for which the evidence supported a conviction. The Court held that in a capital case in which a conviction for a lesser-included offense could be justified by the evidence, the jury should not be given an all-or-nothing choice. Kontakis, arguing from Beck, contends that the court's refusal to give the passion/provocation charge wrongfully precluded the jury from convicting him on that lesser-included offense. In support of this contention, Kontakis points to evidence that his wife left him, took his child, and committed adultery. He asserts that these circumstances caused him to act in the heat of passion when he shot her. The district court found that this evidence did not support a passion/provocation instruction, and we agree.[14]
 
 
 42
 Under New Jersey law, passion/provocation manslaughter has four elements, one of which is that the provocation must be adequate. State v. Coyle, 119 N.J. 194, 574 A.2d 951, 967 (1990). In some circumstances, adequate provocation may be shown through a course of ill treatment that the defendant reasonably believed would continue. See State v. Guido, 40 N.J. 191, 191 A.2d 45, 56 (1963). But in this case, the state courts held that the evidence did not demonstrate a level of ill treatment sufficient to justify the charge under state law. We cannot reject this conclusion for there is, after all, no federal constitutional requirement that a state recognize marital misconduct as justifying a homicide or lessening the consequences which otherwise would follow from the homicide. Rather, it may prefer the more civilized approach of leaving the settlement of these disputes to the matrimonial courts. Nothing in Beck permits us to grant habeas relief when a state court refuses to charge a jury that it may convict a defendant for an offense when under state law the evidence could not justify the conviction.
 
 
 43
 3. Introduction of Mary McLaughlin's testimony
 
 
 44
 Kontakis contends that the trial court's admission of Mary McLaughlin's testimony violated his Sixth Amendment confrontational clause rights and his due process right to a fair trial and fundamental fairness. McLaughlin testified that on February 4, 1982, she saw Margaret Kontakis "banging at another door, for help." McLaughlin then called out to her to come to McLaughlin's apartment. McLaughlin testified that when Margaret Kontakis entered the apartment she was shaking, crying, and frightened, and said that Kontakis had placed a gun to her forehead that morning. McLaughlin also testified that she saw Kontakis "looking for somebody," while he was walking quickly around the building. She testified that it appeared he was carrying something.
 
 
 45
 Kontakis contends that the admission of his wife's statements through McLaughlin's testimony denied him his Sixth Amendment right to confront Margaret as a witness. We reject this argument because the Appellate Division held that the statement properly was admitted under state law under the excited utterance exception to the hearsay rule. Of course, the Sixth Amendment was not infringed by this evidence, as the amendment does not preclude admission of evidence under firmly rooted exceptions to the hearsay rule. See White v. Illinois, U.S. ----, ---- n. 8, 112 S.Ct. 736, 742 n. 8, 116 L.Ed.2d 848 (1992).
 
 
 46
 Furthermore, for the admission of evidence in a state criminal proceeding to rise to the level of a constitutional error, the petitioner must show that the "use of the evidence" caused "fundamental unfairness" in violation of due process. Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941). Brecht compels us to apply the Kotteakos harmless error test to determine whether the unconstitutional admission of evidence in a state proceeding justifies the granting of relief, inasmuch as a mistaken evidentiary ruling falls with the trial category of constitutional error. Therefore, even if we found the admission of McLaughlin's testimony unconstitutional to the extent it included Margaret's statements, which we do not, we nevertheless would deny habeas relief unless, in the words of Brecht, the evidence had a "substantial and injurious effect or influence in determining the jury's verdict."
 
 
 47
 McLaughlin's testimony could not have had such a consequence. The trial record is replete with eye-witness testimony that Kontakis carefully fired three bullets into his wife's head. In these circumstances, the evidence that he threatened her three years earlier was not significant. This was, after all, not a case in which identity of the killer was in issue so that evidence of earlier threats was critical in establishing his identity. Therefore we conclude that, assuming arguendo the admission of McLaughlin's testimony was unconstitutional, any error therefrom was harmless.
 
 4. Kontakis' remaining arguments
 
 48
 Kontakis also objects to the district court's rejection of his arguments that prosecutorial misconduct and/or the admission of Peter Zielinski's testimony mandate the granting of the writ. We will reject these arguments without detail, for we agree with the district court that they are without merit.
 
 III. CONCLUSION
 
 49
 For the foregoing reasons, we will reverse the order of February 16, 1993, as amended by the order of March 8, 1993, and will remand the matter to the district court for entry of an order denying Kontakis' petition for a writ of habeas corpus.[15]
 
 SUR PETITION FOR REHEARING
 April 8, 1994
 
 50
 Before: SLOVITER, Chief Judge, and BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, and LEWIS, Circuit Judges, and POLLAK, District Judge**.
 
 
 51
 The petition for rehearing filed by the appellee, Nicholas Kontakis, in the above captioned matter having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the court in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.
 
 
 
 *
 Honorable Louis H. Pollak, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 He was not required to cross-appeal, as by raising these issues he is not seeking to enlarge his rights beyond those granted by the district court's order. See Lippay v. Christos, 996 F.2d 1490, 1503 (3d Cir.1993)
 
 
 [2]
 In this portion of the instructions the court stated:
 Apart from his general denial of guilt, the Defendant maintains that he's not guilty of the crime of murder, by reason of mental disease or defect, such that he did not act purposely and knowingly, at the time of the incident. If you find that the State has failed to prove, beyond a reasonable doubt, any essential element of the offense, or defendant's participation in the offense, you must find [Kontakis] not guilty and you need not consider the evidence as to defendant's state of mind.
 App. at 2052.
 
 
 [3]
 At the time of Kontakis' trial, N.J.Stat.Ann. Sec. 2C:4-2 (West 1982) provided that:
 Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense. Mental disease or defect is an affirmative defense which must be proven by a preponderance of the evidence.
 The last sentence which this court in Humanik held altered the state's burden of proof has been deleted by an amendment to the statute. See N.J.Stat.Ann. Sec. 2C:4-2 (West Supp.1993).
 
 
 [4]
 Kontakis has exhausted his state court remedies
 
 
 [5]
 We have jurisdiction under 28 U.S.C. Sec. 1291 and 28 U.S.C. Sec. 2253
 
 
 [6]
 In Breakiron, the New Jersey Supreme Court set out the preliminary conditions for admission of mental disease and defect evidence, stating as follows:
 (1) that the condition [the defendant] purports to establish is relevant to his ability to have formed the requisite criminal mental state;
 (2) that the medical theory underlying the effect of the condition upon the relevant mental state is generally accepted within the scientific community; and
 (3) that the evidence defendant plans to adduce is relevant to show the existence of the condition.
 Breakiron, 532 A.2d at 214.
 
 
 [7]
 The cases are Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) (unconstitutionally broad jury instructions); Carella v. California, 491 U.S. 263, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989) (jury instruction containing an erroneous conclusive presumption); Pope v. Illinois, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987) (jury instruction misstating an element of the offense); and Rose v. Clark, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (jury instruction containing an infirm presumption)
 
 
 [8]
 Brecht also acknowledged that "in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." Brecht, --- U.S. at ---- n. 9, 113 S.Ct. at 1722 n. 9. Kontakis does not argue that his case falls within this exception, so we need not address the issue
 
 
 [9]
 Brecht effectively has overruled the portion of our opinion in Rock v. Zimmerman, 959 F.2d 1237, 1249 (3d Cir.) (in banc), cert. denied, --- U.S. ----, 112 S.Ct. 3036, 120 L.Ed.2d 905 (1992), that provided for a "beyond a reasonable doubt" harmless error standard for constitutionally infirm jury instructions. We applied the Chapman standard in Rock for we quite reasonably relied on Yates v. Evatt, 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991), which, as the Court acknowledged in Brecht, was a habeas case in which that standard was applied. Brecht, of course, is of great significance because it flatly rejected use of the Chapman test in federal habeas cases involving trial-type error. Under Chapman relief must be granted if there was a federal constitutional error unless the error was harmless beyond a reasonable doubt. This rejection of the Chapman standard and the adoption of the Kotteakos test is certain to change the outcome in some habeas cases. In fairness to the district court, we point out that the Court decided Brecht after the district court granted the writ in this case. Accordingly, the district court understandably believed that it was required to conclude from the instructions themselves that they were prejudicial
 
 
 [10]
 But Kontakis does not argue that the exclusion of Perr's testimony by the Appellate Division, as distinguished from the trial court's jury instructions, violated his due process rights
 
 
 [11]
 Kontakis points to this evidence as showing that the Appellate Division wrongly concluded that Kontakis failed to satisfy the Breakiron standards. Kontakis does not contend specifically that, because the jury instruction precluded the jury from properly weighing this lay evidence, the instruction violated his constitutional rights. We, however, believe that to resolve this appeal, we must address this issue
 
 
 [12]
 Moreover, we have found that "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." Geschwendt v. Ryan, 967 F.2d 877, 888-89 (3d Cir.) (in banc), cert. denied, --- U.S. ----, 113 S.Ct. 472, 121 L.Ed.2d 379 (1992) (citing Zettlemoyer v. Fulcomer, 923 F.2d at 309)
 
 
 [13]
 The court charged on purposeful murder, knowing murder, aggravated manslaughter, and reckless manslaughter. In accordance with the court's instructions, the jury first considered the charge of purposeful murder and, having convicted Kontakis on that charge, it did not return a verdict on the other three offenses
 
 
 [14]
 The appellants argue that the validity of Vujosevic v. Rafferty, 844 F.2d 1023 (3d Cir.1988), which applied Beck in a non-capital case, is in doubt, citing Schad v. Arizona, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), and Geschwendt v. Ryan, 967 F.2d at 884 n. 13. Accordingly, the appellants would limit Beck to capital cases. In view of our disposition of the Beck issue, we do not address this contention
 
 
 [15]
 The court notes that the district court appointed John Vincent Saykanic, a member of the New Jersey bar, to represent Kontakis in this case and that he ably has represented Kontakis in both the district court and this court in the finest traditions of the legal profession
 
 
 **
 Honorable Louis H. Pollak, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation